# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INCYTE CORPORATION,
1801 Augustine Cut-Off
Wilmington, DE 19803,

        *Plaintiff*,

    v.

XAVIER BECERRA, SECRETARY OF THE U.S.
DEPARTMENT OF HEALTH AND HUMAN
SERVICES,
200 Independence Avenue SW
Washington, DC 20201,

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,
200 Independence Avenue SW
Washington, DC 20201,

CHIQUITA BROOKS-LASURE,
ADMINISTRATOR OF THE CENTERS FOR
MEDICARE & MEDICAID SERVICES,
7500 Security Boulevard
Baltimore, MD 21244,

CENTERS FOR MEDICARE & MEDICAID
SERVICES,
7500 Security Boulevard
Baltimore, MD 21244,

        *Defendants*.

Civil Action No. 1:21-cv-3378

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Incyte Corporation ("Incyte") alleges as follows:

## INTRODUCTION

1.      This action challenges a final rule promulgated by the Centers for Medicare & Medicaid Services ("CMS") that unlawfully requires Incyte to pay massive amounts in unwarranted rebates to state Medicaid programs for Incyte's recently approved new dermatology drug Opzelura™ (ruxolitinib), on the theory that this new cream product is a "line extension" of Incyte's pre-existing oral tablet cancer drug Jakafi® (ruxolitinib).  For the reasons explained, the final rule is inconsistent with the governing statute, exceeds CMS's authority, and would cause significant harm both to Incyte specifically and to pharmaceutical innovation more broadly.  The Court accordingly should hold the rule unlawful as applied to Opzelura and Jakafi.

2.      Under the Medicaid Drug Rebate Program, pharmaceutical manufacturers must pay rebates to state Medicaid agencies when their drugs are reimbursed by these agencies.  The rebate amount is calculated based in part on the Average Manufacturer Price (AMP) of a drug during the first full quarter after it was first marketed, known as the drug's "base date AMP."  The base date AMP serves as a baseline to ensure that Medicaid does not pay more for a drug than what it cost when it was first put on the market, adjusted for inflation.  If a drug's AMP increases faster than the rate of inflation, measured by the "consumer price index for all urban consumers" or "CPI-U," manufacturers must pay a dollar-for-dollar rebate making up the difference between the inflation-adjusted base date AMP and the current period AMP for the product.  Because the base date AMP is generally used to calculate Medicaid rebates for the entire life of the relevant drug, it is critically important to get a drug's base date AMP right.  Failure to calculate Medicaid rebates accurately can result in significant penalties, including violations of the False Claims Act (FCA) if the calculation error results from specific intent to defraud or reckless disregard.

3.      In the Affordable Care Act (ACA), enacted in 2010, Congress added a provision to the Medicaid rebate statute designed to penalize manufacturers that seek to lower their Medicaid rebate liability by generating new base date AMPs for what are essentially existing drugs. Congress was concerned that manufacturers could make a slight alteration to an existing drug, call it a new "drug" and thereby assign it a new base date AMP, and then phase out the original drug. By shifting sales from the original drug to a slightly altered form of the drug that treats the same indications and serves the same patients, manufacturers could effectively circumvent the requirement that a manufacturer selling an older drug must pay greater rebate amounts where price increases for that drug had outpaced the rate of inflation.  As another court in this District has explained, Congress enacted the ACA's line extension provision to prevent manufacturers from "avoid[ing] incurring additional rebate obligations by making slight alterations to existing products, sometimes called line extensions." *Ipsen Biopharmaceuticals, Inc. v. Azar*, No. 16-CV-2372 (DLF), 2020 WL 3402344, at *11 (D.D.C. June 19, 2020) (quoting S. Rep. No. 111-89 at 92 (2009)).

4.      Specifically, the Medicaid rebate statute defines a "line extension" as "a new formulation of the drug, such as an extended release formulation, but does not include an abuse-deterrent formulation of the drug … , regardless of whether such abuse-deterrent formulation is an extended release formulation."  42 U.S.C. § 1396r-8(c)(2)(C).  The statute limits the alternative rebate for line extensions to apply only to a drug that is a "line extension of a single source drug or innovator multiple source drug that is an oral solid dosage form."  *Id.* § 1369r-8(c)(2)(C).  The statute requires that a manufacturer of a new drug that satisfies these limitations must use an alternative rebate formula that subjects the new drug to a Medicaid unit rebate amount tied to the

base date AMP of the *original* product (or to a prior line extension product that results in the highest additional rebate amount as a percentage of AMP).

5.      On December 31, 2020, CMS adopted a final rule that, for the first time since the ACA's enactment in 2010, purports to define the terms "line extension" and "new formulation." The rule defines a "line extension" as a "new formulation," and in turn defines a "new formulation" as "a change to the drug, including, but not limited to: an extended release formulation or other change in release mechanism, a change in dosage form, strength, route of administration, or ingredients."   Medicaid Program; Establishing Minimum Standards in Medicaid State Drug Utilization Review (DUR) and Supporting Value-Based Purchasing (VBP) for Drugs Covered in Medicaid, Revising Medicaid Drug Rebate and Third Party Liability (TPL) Requirements, 85 Fed. Reg. 87,000, 87,101-02 (Dec. 31, 2020).  The rule also expands the pool of existing drugs that fall within the sweep of the statutory line extension provision, asserting for the first time that, to qualify as a line extension, "only the initial … drug must be an oral solid dosage form."  *Id.* at 87,033. The relevant provisions of the final rule are set to take effect on January 1, 2022.  *Id.* at 87,041.

6.      CMS's definitions of the terms "line extension" and "new formulation" are sweeping in scope and unmoored to the statutory text.  Under CMS's construction, so long as two drugs contain the same active ingredient, the first of the drugs is an oral solid dosage form, and there is "a change to the drug," then one is a line extension of the other irrespective of how different they otherwise are in terms of the diseases and patients they treat and how innovative the new drug is.  85 Fed. Reg. 87,101-02.  CMS's definition stretches far beyond the statute's legitimate sweep, extending to new and innovative drugs requiring significant investment and years of development that Congress never intended to reach, such as the circumstances presented here.

7.      This a case where a new drug falls within CMS's expansive regulatory definition of "line extension" but far outside the statutory text, purpose, and history.  Incyte recently received FDA approval for a revolutionary new drug, Opzelura (ruxolitinib) cream.  Opzelura is indicated for the topical treatment of atopic dermatitis, an inflammatory condition commonly referred to as eczema, which makes the skin red and itchy.  This is the first time that FDA has approved a drug with this type of mechanism of action for this type of dermatological use.  To date, Incyte has spent approximately $470 million to develop and obtain the regulatory approval of this innovative topical drug for dermatological conditions and, by the end of 2024, Incyte estimates it will have invested over $600 million in Opzelura.

8.      Incyte also manufactures an existing oncology drug containing the same active molecule in oral tablet form, Jakafi (ruxolitinib), which is indicated for the treatment of certain rare blood cancers known as myeloproliferative neoplasms (specifically myelofibrosis and polycythemia vera), as well as graft versus host disease, a condition that might occur after an allogeneic bone marrow transplant necessitated by an underlying cancer or rare hematological disorder.  Jakafi is an oral cancer medicine for the treatment of serious, life-threatening diseases involving the body's autoimmune system, but it in no way resembles a skin cream for treating atopic dermatitis.

9.      Notwithstanding that Opzelura is for a different disease suffered by different patients who require a different dosage form and different method of administration as compared to Jakafi, CMS's rule nonetheless treats Opzelura as a "line extension" of Jakafi, subject to substantially increased Medicaid rebates calculated based on Jakafi's AMP and base date AMP (the first quarter of 2012).  Under CMS's definition of "line extension," none of the massive

differences between the two products—including that they treat entirely different conditions—matters. All that matters is that both contain the same active ingredient (ruxolitinib).

10.     That reading of the statute is wrong, as Congress's choice to use the descriptive term "line extension" shows. A "line extension" is an *extension* of a drug *line*, one where the two drugs treat the same pathologies and the patients overlap. That is why Congress expressly singled out extended release formulations and abuse deterrent formulations as examples of a "line extension"—both types of drug reformulations virtually always treat the same conditions and patients as the original drug, but with formulation properties that permit less frequent dosing or that address safety concerns. In sharp contrast, Opzelura is a different product that treats different patients, with different diseases, with a completely different route of administration. Congress never meant for innovative new drugs like Opzelura to be deemed "line extensions" of drugs like Jakafi. Additional textual and contextual clues in the statute, and the overwhelming weight of the legislative history, reinforce this conclusion.

11.     CMS' reading of the statute also fails because the statutory text demonstrates that the "line extension" provision does not apply where, as here, the new drug is not an "oral solid dosage form." The statute makes clear that it applies to any drug that is a "line extension of a single source drug or innovator multiple source drug that is an oral solid dosage form." 42 U.S.C. § 1369r-8(c)(2)(C). The unambiguous import of that text is that the "line extension," like the original drug, must be "an oral solid dosage form." This conclusion is reinforced by the Medicaid rebate statute's requirement that manufacturers calculate a new base date AMP for every "dosage form and strength" of a drug, 42 U.S.C. § 1396r-8(c)(1)(A), reflecting that a change in dosage form is already a significant enough change to merit a new and separate AMP.

12.    Further illustrating the arbitrary approach CMS has taken to define "new formulations," if a company makes a drug in liquid form to be administered through an intravenous injection, and the company develops the identical drug in oral tablet form, it would have to calculate a new AMP.  CMS's rule now provides that *that* change—from a liquid to an oral solid—does not trigger the alternative line extension rebate provision, but a change in the other direction—from an oral solid to a liquid—*does*.  CMS provides no explanation in the rule as to why Congress would want to exempt one change in dosage form from the alternative rebate provision but include the other, or why it would be reasonable to conclude that Congress wrote a statute that does so when another better interpretation of the same statutory text is available.

13.    The line extension provision's extensive legislative history removes any doubt that Congress's purpose was narrow.  The provision codifies a "Budget Option" proposed by the Congressional Budget Office (CBO) in 2008, which explained that the provision would cover "slight alterations" to existing drugs and calculated its budget impact accordingly.  In fact, the CBO suggested that the provision would not sweep beyond extended release formulations. Multiple subsequent Congressional committee reports discussing the provision reflected the exact same understanding, namely that the provision would apply to drugs involving "slight alterations." Four years later, when Congress amended the line extension provision to exclude abuse deterrent formulations, Congress acknowledged that treating abuse deterrent formulations as line extensions in the first place was "unintended."  And as important as what the legislative history says is what it does not say:  nowhere in the history of this provision has there ever been any suggestion that it would apply to highly innovative new drugs indicated to treat new conditions and that serve different patient populations, or indeed to any drug that is more than a "slight alteration" of an existing drug.

14.     During the notice and comment process, Incyte informed CMS about the conflict in its proposed definitions and the terms of the statute, and that those proposed definitions would wrongly encompass Opzelura as a line extension of Jakafi.  *See* Letter From Barry Flannelly, Executive Vice President, Incyte Corporation, to Seema Verma, July 17, 2020*, Comment ID CMS-2020-0072-19011,  https://www.regulations.gov/comment/CMS-2020-0072-19011.   But  CMS ignored those concerns.

15.     After the rulemaking, Incyte again wrote to CMS articulating its legal interpretation, along with a comprehensive 18-page white paper setting forth the scientific differences between Jakafi and Opzelura.  Ex. A; Ex. B.  Incyte closed its letter with an offer to meet with CMS to discuss the matter further.  Ex. A.  But, in spite of Incyte's good faith and detailed requests, CMS refused to confirm that Opzelura is not a line extension of Jakafi under the statute, or even to engage in a discussion with Incyte on this matter.  Instead, CMS left it to Incyte, directing Incyte to make its own "reasonable assumption" regarding whether Opzelura is a line extension of Jakafi under the final rule.  Ex. C.

16.     CMS' refusal to engage  ignores the practical consequences of choosing to classify Opzelura as a line extension or not a line extension, and the impact that this classification will have on the determination of Medicaid rebates for Opzelura.  The consequences of making an incorrect determination in this context are far too severe to rely on such a unilateral assumption and further leaves those who certify to the accuracy of the reported rebates vulnerable to an assertion of knowingly violating the rebate statute.  Incyte could face enormous civil monetary penalties (or potentially take on False Claims Act risks) if the company knowingly or recklessly misclassifies drug product information or knowingly or recklessly calculates its Medicaid rebates incorrectly.

17.     With CMS's definitions of "line extension" and "new formulation" set to take effect on January 1, 2022, CMS's refusal to engage has left Incyte with no choice but to file this action seeking to declare the rule unlawful insofar as it requires the company to treat Opzelura as a line extension of Jakafi.

18.     Using all of the traditional tools of statutory interpretation, including text, context, structure, legislative history, and purpose, the Court should hold that CMS's rule is contrary to the ACA's line extension provision and exceeds CMS's statutory authority, and should set aside the final rule as applied to Opzelura.  The Court should declare that Opzelura is a new and different drug product for purposes of the Medicaid rebate program, not a mere "line extension" of Jakafi subject to additional rebates, and should reject any CMS determination to the contrary.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Incyte's claim arises under the laws of the United States.

20.     Venue is proper in this district under 28 U.S.C. § 1391 because Defendants reside in this district and a substantial part of the events giving rise to this action occurred in this district.

21.     An actual controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201 & 2202 and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 705 & 706.

## PARTIES

22.     Incyte is a global biopharmaceutical company founded on the premise that investment in strong science and the relentless pursuit of research-and-development excellence can translate into new solutions that can positively affect patients' lives.  Initially established as a genomics company in the 1980s, Incyte's drug discovery and development efforts were founded

in 2002 in Wilmington, Delaware, by a committed team of research scientists, chemists, and biologists working in immunology. Today, Incyte employs more than 2,000 people and operates in the United States, Canada, Europe, and Japan. From 2018 through 2020, Incyte spent over $4.5 billion on research and development, representing approximately 68% of the company's total net revenues during that time. Incyte's unique expertise in medicinal chemistry and biology has enabled the creation of a diversified portfolio of marketed products and clinical candidates, the majority of which were discovered by Incyte scientists. Incyte is advancing a growing pipeline of medicines across two franchises: Oncology and Inflammation & Autoimmunity. Founded on a deep scientific commitment to advance therapeutic options for patients, Incyte's talented team of world-class scientists has made discoveries that advance therapeutic options for patients and enable Incyte to identify new molecules, decipher new pathways, and develop first-in-class medicines.

23.     Defendant Xavier Becerra is the Secretary of the United States Department of Health and Human Services (HHS). He oversees, among other things, CMS and the Medicaid program. He is sued in his official capacity.

24.     Defendant HHS is an executive department of the United States Government headquartered in Washington, D.C., and responsible for CMS and the Medicaid program.

25.     Defendant Chiquita Brooks-LaSure is the CMS Administrator. She administers the Medicaid program on behalf of the Secretary and oversees CMS's activities. She is sued in her official capacity.

26.     Defendant CMS is an administrative agency within HHS, headquartered in Baltimore, MD that administers the Medicaid program. CMS promulgated the rule at issue.

## STATUTORY AND REGULATORY FRAMEWORK

### *The Medicaid Drug Rebate Program*

27.     Medicaid authorizes federal financial assistance to states that reimburse certain costs of medical treatment.  *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 650 (2003).  In 1990, Congress established the Medicaid Drug Rebate Program, 42 U.S.C. § 1396r–8, to "give Medicaid the benefit of the best price for which a manufacturers sells a prescription drug to any public or private purchaser," H.R. Rep. No. 101-881, at 96 (1990).  Under the Medicaid rebate statute, for drugs to qualify for reimbursement under the Medicaid program and other specified federal healthcare programs, a manufacturer must enter into an agreement with the Secretary of Health and Human Services to provide quarterly rebates to states on Medicaid sales of the manufacturer's covered outpatient drugs.  *Id*. § 1396r-8(b), (c).  Federal payments to each state are reduced by rebates the state receives from manufacturers.

28.     Today, the Medicaid Drug Rebate Program covers a significant portion of drug purchases in the United States.  *See Astra USA, Inc. v. Santa Clara Cnty.*, 131 S. Ct. 1342, 1346 (2011) (citing Gov't Accountability Office, GAO-07-481T, Prescription Drugs: Oversight of Drug Pricing in Federal Programs 1 (2007)).  While participation is ostensibly voluntary, to gain payment under Medicaid and Medicare Part B for covered drugs, a manufacturer must enter a standardized agreement with HHS; in the agreement, the manufacturer must agree to provide rebates to States on their Medicaid drug purchases.

29.     Each quarter, state Medicaid programs report to CMS the quantity of each drug paid for by each state Medicaid program during that quarter.  42 U.S.C. § 1396r-8(b)(2).  The manufacturer reports to CMS the "Average Manufacturer Price" (AMP) and "Best Price" for its covered drugs for that quarter.  *Id.* § 1396r-8(b)(3).  AMP is defined as the average price paid to

the manufacturer for the drug by retail community pharmacies and by wholesalers for drugs distributed to retail community pharmacies, excluding "customary prompt pay discounts extended to wholesalers" and certain other items. *Id.* § 1396r-8(k)(1)(A)-(B). The "Best Price" is defined as the "lowest price available" from the manufacturer during the relevant period to any "wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States, excluding" prices made available to certain governmental and nongovernmental entities and under certain other programs. *Id.* § 1396r-8(c)(1)(C).

30.     Using the data from the manufacturer, CMS calculates the amount that the manufacturer should pay the state Medicaid agencies for each unit of the manufacturer's covered drugs used by a Medicaid beneficiary. This is known as the unit rebate amount ("URA"). The state Medicaid agencies then use the URA to invoice the manufacturers for the rebates owed under the agreement entered into pursuant to the Medicaid rebate statute.

31.     The URA for a single source (i.e., an innovator) drug, like Jakafi, consists of two components: the basic rebate and the additional rebate. *Id.* § 1396r-8(c).

32.     The *basic rebate* is the product of: (1) the total number of doses of each dosage form and strength paid for by the state during the quarter and (2) the greater of (a) the difference between the drug's AMP and its Best Price, as defined by the statute and CMS regulations, or (b) a statutorily specified minimum rebate percentage of 23.1% of the drug's AMP. *Id.* § 1396r-8(c)(1)(A)(ii). Once the basic rebate is paid, the state Medicaid agencies should end up having paid either the "best price" for the drug or 23.1% less than the AMP, whichever is cheaper.

33.     The *additional rebate* applies when a drug's AMP rises faster than the rate of inflation, measured by the CPI-U. The additional rebate is defined as the amount, if any, by which the drug's AMP for the relevant quarter exceeds the "base date AMP," a baseline measure of the

drug's price during the first full calendar quarter after the product launch, as adjusted by the CPI-U.  *Id.* § 1396r-8(c)(2)(A)(ii).  The additional rebate thus requires manufacturers to pay greater rebate amounts where price increases for a drug have outpaced the rate of inflation, measured by the CPI-U.

34.     For example, if: (a) a drug's base date AMP (the AMP in the first full calendar quarter after product launch) was $100, (b) that base date AMP, when adjusted over time for the CPI-U, hypothetically is $110, and (c) the drug's AMP for the current reporting quarter is $120, the drug's price increase has outpaced the rate of inflation, and the additional rebate amount is thus $120 - $110 = $10 (the difference between the drug's AMP for the current quarter and the base date AMP adjusted for inflation).  This additional rebate amount is added to the basic rebate amount and the two amounts added together determine the total URA.

35.     The statute requires the calculation of a distinct AMP and URA—and thus a distinct base date AMP—for "each dosage form and strength of a single source drug."  *Id.* § 1396r-8(c)(1)(A).  In other words, a drug manufacturer must calculate a new base date AMP if either: (a) the product in question is a different single source drug, or (b) the product is a different dosage form or strength of an existing single source drug.  Dosage form in this regard refers to the physical form in which a drug is produced and dispensed (e.g., a tablet, a capsule, or an injectable), whereas strength tells how much of the active ingredient is present in each dosage (e.g. 50 mg vs 100 mg).

36.     Under this statutory framework, the rebate calculation hinges on whether a product is a distinct "drug" as well as on its dosage forms and strengths.  As particularly relevant here, the base date AMP derived from when a "drug" is first marketed is an important component of the additional rebate calculation.

13

37.     In determining proper Medicaid rebates and reporting related data to CMS, manufacturers are required to make "reasonable assumptions" "in the absence of specific guidance" in the statute or regulations.  CMS, National Drug Rebate Agreement, § II(k), 83 Fed. Reg. 127770, 12758 (Mar. 23, 2018); *see also* CMS, Final Rule; Medicaid Program; Covered Outpatient Drugs, 81 Fed. Reg. 5170, 5265 (Feb. 1, 2016) ("at this time, manufacturers are to rely on the statutory definition of line extension at section 1927(c)(2)(C) of the Act, and where appropriate, are permitted to use reasonable assumptions in their determination of whether their drug qualifies as a line extension drug"); 84 Fed. Reg. 12130, 12132 (Apr. 1, 2019) (reiterating the same "reasonable assumptions" guidance, citing the 2016 final rule).   However, if a manufacturer's assumptions are challenged in an enforcement action brought by the Government or a False Claims Act lawsuit brought by a private whistleblower, then the manufacturer could be subject to significant liability, including penalties and treble damages and exclusion from federal healthcare programs.  *See, e.g.*, *United States ex rel. Streck v. Bristol-Myers Squibb Co.*, 370 F. Supp. 3d 491, 494 (E.D. Pa. 2019) (alleging defendant manufacturer "underreport[ed] AMP and lower[ed] the [Medicaid] rebate it owed" in violation of the False Claims Act and finding that the defendant's reading of the statute was not "reasonable"); *see also* 42 U.S.C. § 1396r-8(b)(3)(C) (imposing monetary penalties for violations of manufacturer duties under the Medicaid rebate statute).   Accordingly, in some circumstances, absent guidance from CMS or a court, a manufacturer may be put in a Catch-22 of either paying massive rebates that the manufacturer believes are unwarranted or risking enormous financial liability in a later enforcement action or a False Claims Act suit.

### *The Affordable Care Act's "Line Extension" Provision*

38.     In the Affordable Care Act (ACA), Congress amended the Medicaid rebate statute to establish an alternative rebate formula for a "line extension" of a single source drug or innovator multiple source drug that is in a solid oral dosage form.  *See* 42 U.S.C. § 1396r-8(c)(2)(C).  The intent was to address the practice of treating a slight alteration of an existing drug as an entirely new drug and giving it a new base date AMP, thus avoiding the need to pay additional rebates when the current period AMP of the new drug is higher than the inflation-adjusted base date AMP of the original drug.

39.     Today, the statute defines a "line extension" as "a new formulation of the drug, such as an extended release formulation, but does not include an abuse-deterrent formulation of the drug." *Id.* § 1396r-8(c)(2)(C).  Under the statute, a drug that is a line extension still gets its own base date AMP, and manufacturers are still required to calculate a *basic rebate* and an *additional rebate* for the drug, exactly as they would if the drug were not a line extension.  *See Id.* § 1396r-8(c)(2)(C)(ii).  However,  they are also required to calculate an *alternative rebate*. *Id.* § 1396r-8(c)(2)(C)(iii).  That alternative rebate should be calculated by taking the *basic rebate* for the line extension and adding to it a new *line extension rebate*.  According to CMS, this alternative *line extension rebate* should be calculated by multiplying the AMP for the line extension or original oral solid dosage form by the highest additional rebate amount (calculated as a percentage of AMP) for any strength of the original single source drug.   The product of that calculation should then be multiplied by the total number of units purchased of each dosage form and strength of the line extension product.  If this alternative line extension rebate calculation results in a higher rebate amount than the standard additional rebate calculation, then the manufacturer must pay the *higher* amount derived from the alternative *line extension rebate*

formula. *Id.* § 1396r-8(c)(2)(C)(i).  That a rebate applies to Opzelura is not dispute; in all scenarios a Medicaid rebate is paid on each product; the only question is which rebate should apply.

40.     To see how this works, consider the hypothetical drug described earlier, *see supra* 31, whose additional rebate was $10 because the drug's AMP had outpaced inflation.  Recall that that drug's AMP for the current reporting quarter was $120, meaning the percentage of the AMP paid as an additional rebate was $10/$120, or 8.3 percent.  Now suppose the manufacturer releases a new drug that is a "line extension" of that drug, this time with a base date AMP of $600.   If this new drug were not a line extension that would be the end of the matter.  The manufacturer would owe only the basic rebate and no additional rebate because the $600 current period AMP and the $600 base date AMP would match, and thus the current period AMP would not exceed the base date AMP adjusted by the CPI-U.  But because the new drug is a line extension, the manufacturer would need to take another step and calculate an *alternative rebate* to see if it is higher than the otherwise-applicable additional rebate.  The alternative rebate formula requires the manufacturer to multiply the percentage additional rebate of the original drug (8.3 percent) by the new drug's AMP ($600), which results in an alternative rebate of $50.  That $50 would become the new *alternative rebate* for the line extension per unit dispensed under the Medicaid program.

41.     Tying the rebates for the two drugs together like this makes sense where Congress is trying to combat a circumvention of the additional rebate formula—that is, where the new drug is highly similar to the old one, and the difference could be viewed as an attempt by the manufacturer to release a slightly altered drug at a higher price.  It could even be that Congress considered some new drugs to be actual improvements, but that these improvements were deemed too minor to be entitled to circumvent the additional rebate calculation formula.  Indeed, that has always been recognized as the purpose of the provision.  As another court in this District has

recognized, Congress enacted the ACA's line extension provision to prevent manufacturers from "avoid[ing] incurring additional rebate obligations by making ***slight alterations*** to existing products, sometimes called line extensions." *Ipsen Biopharmaceuticals, Inc. v. Azar*, No. 16-CV-2372 (DLF), 2020 WL 3402344, at *11 (D.D.C. June 19, 2020) (quoting S. Rep. No. 111-89 at 92 (2009)) (emphasis added); *see also id.* (likewise noting that the provision sought to prevent manufacturers from reducing rebate obligations by making "***minor changes*** to existing drugs" (emphasis added)). The provision was specifically "aimed at 'extended release formulations' of preexisting drugs." *Id.*

42.     The legislative history of the line extension provisions repeatedly emphasizes Congress's intent to target only "***slight alterations*** to existing products." H. Rep. No. 111-299, at 635 (2009) (emphasis added); *see also, e.g.*, Senate Finance Comm., "Financing Comprehensive Health Care Reform: Proposed Health System Savings and Revenue Options," at 12 (May 20, 2009), https://bit.ly/3iR6GzO (expressing intent to prevent manufacturers from reducing rebate obligations by making "***slight alterations*** to existing products" (emphasis added)); Senate Finance Comm. Chairman's Mark, America's Healthy Future Act of 2009, S. 1796, 111th Cong., at 54 (Sept. 2009) (expressing concern that "drug makers can avoid incurring additional rebate obligations by making ***slight alterations*** to existing products" (emphasis added)); Congressional Budget Office, Budget Options, Volume I: Health Care, at 143 (Dec. 2008), https://bit.ly/3w58xGq (setting out a proposal to impose alternative rebates on drugs with "***slight alterations***" designed to "avoid incurring an additional ... rebate" (emphasis added)). There is no indication that Congress intended to impose higher rebates on substantially innovative new drugs that take many years to develop and which provide new and different therapeutic benefits for different patients with different diseases.

43.     The legislative history thus makes clear that, in enacting the "line extension" provision, Congress was focused exclusively on "slight" or "minor" alterations to existing products that could serve as an easy means for a manufacturer to obtain a new base date AMP for what was, essentially, the same drug.  The legislative history is replete with references to concerns about "slight alterations" in describing the "loophole" that Congress sought to close.  At that time, the Congressional Budget Office observed that, "[u]nder current law, even a minor change to an existing drug can lead to a 'new' product designation that does not trigger the inflation-related rebate even if the initial price for that new product is substantially higher than the price for the original formulation."  Congressional Budget Office, Budget Options, Volume I: Health Care, at 143 (Dec. 2008), https://bit.ly/3w58xGq.

44.     Nowhere in the legislative history is there any suggestion that the provision should apply to new drugs with new indications to treat different patients in different therapeutic areas. Nor is there any indication that Congress intended to deem virtually any change in a chemical formulation of a drug as a mere "line extension" equivalent to reissuance of the original drug.

45.     In 2016, Congress revised the definition of "line extension" to *exclude* abuse-deterrent formulations. Pub. L. 114–198, title VII, § 705(a), July 22, 2016, 130 Stat. 753.  Notably, at that time, the prevailing guidance from CMS was that drugs like Opzelura were *not* line extensions.  *See* CMS, Final Rule; Medicaid Program; Covered Outpatient Drugs, 81 Fed. Reg. 5,267 (Feb. 1, 2016).[1]  Yet, even as Congress acted to modify the statute to *narrow* the line extension provision's coverage—showing Congress's concern with the precise operation of the

---

[1] Indeed, at that time, even new dosage *strengths* were not being treated as line extensions.  In the preamble to a 2016 final rule, CMS "agree[d] with the commenters and do[es] not consider new strengths of the same formulation of the initial brand name listed drug to be a line extension." CMS clarified that a new strength was not a new formulation and that "section 1927(c)(2)(C) of the Act does not contemplate that a new strength is a line extension drug."  81 Fed. Reg. at 5,236.

provision—Congress gave no indication that it thought CMS needed to *broaden* the provision to sweep in innovative drugs like Opzelura.

46.     As the House Report explained in excluding abuse-deterrent new formulations, Congress enacted this amendment to "correct an unintended consequence in current law by exempting abuse-deterrent formulations (ADF) of prescription drugs from the definition of 'line extension' when calculating Medicaid rebates–thus helping to incentivize the development of ADF to combat opioid abuse."  H.R. Rep. No. 114-559, at 3 (May 10, 2016).  The House Report recognized that FDA considered "the development of these products a high public health priority," that the line extension provision was "disincentivizing their development," and that application of the "line extension" provision to abuse-deterrent formulations was an "unintended consequence in current law."  *Id.* at 4.

47.     Crucially, the two examples of what Congress deemed a line extension—extended release formulations and abuse deterrent formulations (considered a line extension before the 2016 revision)—are both categories of drug products that will almost always have the same indications and treat the same patients as the original drug, but with formulation properties that permit less frequent dosing or that address safety concerns.

48.     Tying the rebates together as the statute does makes no sense in circumstances where the new drug is priced completely differently because it treats an entirely different medical condition, in an entirely different patient population, in an entirely different way.  If a manufacturer were to discover through exhaustive and rigorous studies that an existing oral tablet pain reliever were, if made into a cream, an effective treatment for skin cancer, no one would believe that Congress intended through the line extension rebate provision to tie the rebates for those two drugs together.  Nor would it make sense to tie their prices together because nearly everything about the

two drugs would be different, most importantly the research and development costs of the new drug for the different indication in a different therapeutic area and for different patients. Such is the case here.

49. As the history of the line extension provision shows, Congress carefully avoided a definition that would have a chilling effect on manufacturers when they are making decisions on whether to invest in research for treatments for new diseases and for dramatic improvements to existing treatments. Pharmaceutical innovation is extremely costly, and the regulatory treatment of drugs currently on the market is a consideration for manufacturers in deciding how to allocate limited research and development resources going forward. If manufacturers determine that significant cost barriers caused by the alternative rebate formula are too high, it would dilute incentives for future innovation into new diseases. Such adverse effects on innovation incentives could deprive patients of new drugs to treat different diseases.

*CMS's Attempts to Define "Line Extension"*

50. Recognizing that the ACA's definition of "line extension" made it difficult at times for manufacturers to determine whether some new drugs (such as abuse-deterrent formulations and new dosage strengths) are in fact "line extensions," CMS has repeatedly attempted to define the relevant terms for the purposes of the ACA's line extension provision.

51. Two years after Congress first enacted the "line extension" provision, in 2012, CMS proposed in its Covered Outpatient Drug (COD) proposed rule to define a line extension as "an oral solid dosage form that has been approved by FDA as a change to the initial brand name listed drug in that it represents a new version of the previously approved listed drug." CMS, Medicaid Program; Covered Outpatient Drugs, 77 Fed. Reg. 5,318, 5,360 (Feb. 2, 2012) (Proposed Rule). Under this proposed definition, both the original and new drugs were required to be oral

solid dosage forms. *Id.* at 5,338.  Line extensions also would have been limited to drugs listed in Drugs@FDA (an FDA database that includes most of the drug products approved since 1939) as a change to the initial brand name listed drug in that it represented a new version of the previously approved listed drug, such as a new ester, a new salt or other noncovalent derivative; a new formulation of a previously approved drug; a new combination of two or more drugs; or a new indication for an already marketed drug. *Id.* at 5,323.[2]  CMS also proposed to exclude "new strength[s] of … initial brand name listed drug[s]" from the definition of line extension, *id.* at 5340, a position it maintained consistently through the final rule issued in 2016, *see* 81 Fed. Reg. at 5236 (2016).

52.     CMS never adopted the "line extension" definition from the 2012 proposed rule, including when it finalized the COD rule in 2016.  *See* CMS, Medicaid Program; Covered Outpatient Drugs, 81 Fed. Reg. 5,170, 5,197 (Feb. 1, 2016) ("at this time we have decided not to finalize the proposed regulatory definition of line extension drug").  And the agency again did not adopt this definition when it published regulations from the Bipartisan Budget Act of 2018, implementing a technical correction to the line extension provision, "Medicaid Program; Covered Outpatient Drug; Line Extension Definition; and Change to the Rebate Calculation for Line Extension Drugs," 84 Fed. Reg. 12,130, 12,132 (Apr. 1, 2019) ("we are not finalizing a definition of line extension in this final rule and interim final rule").  Instead, for those periods, it left manufacturers to make reasonable assumptions based on the statutory definition and the limited regulatory guidance that CMS had provided to that point.

---

[2] Opzelura would not have met this definition because Opzelura is not an oral solid dosage form and would not have been listed in Drugs@FDA as "a new formulation of a previously approved drug[.]"

53.     On June 19, 2020, CMS proposed a new rule offering new regulatory definitions for the terms "line extension" and "new formulation."   *See* Medicaid Program; Establishing Minimum Standards in Medicaid State Drug Utilization Review (DUR) and Supporting Value-Based Purchasing (VBP) for Drugs Covered in Medicaid, Revising Medicaid Drug Rebate and Third Party Liability (TPL) Requirements, 85 Fed. Reg. 37,286, 37,288-89, 37,294-95 (June 19, 2020).  In the proposed rule, and consistent with the widely understood purpose of the provision, CMS posited that "[w]e believe the line extension provision was codified in statute to assure that manufacturers are not circumventing rebate liability by creating a line extension drug and avoiding inflation-based additional rebates."  *Id.* at 37294.  But the agency then pivoted and construed the line extension provision to sweep far more broadly than appropriate given this limited purpose.

54.     The agency thus asserted that "[u]pon further evaluation," "we believe that the statutory text can be reasonably construed to provide that only the initial single source drug or innovator multiple source drug must be an oral solid dosage form," and that such a construction furthered the statutory purpose of avoiding circumvention.  *Id.*  CMS then noted that "[b]ased on the definition of line extension that was included in the Affordable Care Act, we believe that the statute gives us discretion and authority to interpret the term 'line extension' broadly."   *Id.* at 37,295.  CMS accordingly proposed to define "new formulation" to sweep in any "changes in dosage form, strength, route of administration, ingredients, pharmacodynamics, or pharmacokinetic properties; changes in indication accompanied by marketing as a separately identifiable drug (for example, a different NDC); and combination drugs, such as a drug that is a combination of two or more drugs or a drug that is a combination of a drug and a device."  *Id.*

55.     On December 31, 2020, after receiving comments from Incyte and many other stakeholders, CMS issued a final rule defining "line extension" and "new formulation" in a manner

similar to the proposed rule.  85 Fed. Reg. at 87,101-02.  The new rule defined "[l]ine extension" to mean "for a drug, a new formulation of the drug, but does not include an abuse-deterrent formulation of the drug (as determined by the Secretary)."  *Id.*  The rule defined "[n]ew formulation" to mean, "for a drug, a change to the drug, including, but not limited to: an extended release formulation or other change in release mechanism, a change in dosage form, strength, route of administration, or ingredients."  *Id.*  As in the proposed rule, the final rule determined that, to qualify as a line extension, "only the initial … drug must be an oral solid dosage form," while the new drug may take another form.  *Id.* at 87,033.  The rule's new definitions are set to take effect January 1, 2022.  *Id.* at 87,041.

56.     CMS's final rule contains material inconsistencies.  As an initial matter, the rule is inconsistent with respect to Congress's purpose in enacting the line extension provision.  On the one hand, CMS correctly recognized that the purpose of the line extension provision was to prevent manufacturers from "circumventing rebate liability by creating a line extension drug and avoiding inflation-based additional rebates."  *Id.* at 37,294.  But on the other hand, CMS incorrectly concluded that "[w]e do not believe that the statute requires that the treatment of a drug that is a line extension is dependent on the extent of the improvements, the value of the innovation, or the expense that manufacturers incur when developing new formulations.  If Congress had intended these factors to limit the scope of drugs that are line extensions, it would have provided as much in statute. While CMS recognizes the value of innovation and improvements, we also recognize the importance of giving full effect to the statute," *id.* at 87,038.  While acknowledging the Congressional references to "slight alterations," CMS inappropriately gave no weight to this aspect of the legislative history of the line extension provision.  CMS did not provide any explanation for Congress's repeated references to "slight alterations" leading up to the initial enactment of the

provision in 2010.  Nor did CMS credit the fact that Congress amended the statute in 2016 to exclude abuse-deterrent formulations; nor did it take into account that Congress had explicitly concluded that making abuse-deterrent formulations "line extensions" was "*unintended*."

57.   Second, the rule is inconsistent in its interpretation of the plain textual meaning of the terms "line extension" and "new formulation."  On the one hand, CMS specifically excluded certain types of drugs from the regulatory definition of "new formulation" because treating those drugs as mere "line extensions" would stifle too much innovation.  *See id.* at 87,097.  For this reason, for example, CMS appropriately determined that "combination" drugs, that is, drugs that contain active ingredients from two predecessor drugs, are not "new formulations" of either drug, and hence not line extensions.  *Id.* at 87,039.  For the same reason, CMS determined that an existing drug approved for a new indication, but not otherwise altered, would not be considered a "new formulation" and hence not a "line extension."  *Id.* at 87,040.  CMS expressly justified these conclusions on the grounds that "*obtaining approval for new indications of existing therapies can require significant investments in research and development, including new clinical studies,*" "*the introduction of a new indication can have significant benefits for patients,*" and "*it would disincentivize manufacturers to provide treatment options for rare disease patients.*"  *Id.* (emphasis added).  Further and importantly, CMS also excluded from the definition of "new formulation" any new drugs that involve a change to the "pharmacokinetics or pharmacodynamics" of the active ingredient used in an existing drug, concluding that treating such drugs as mere line extensions would "incorporate[] a broader range of changes [to existing drugs] than we intended."  *Id.*

58.   The last exclusion highlights the inconsistent nature of CMS's interpretation of the statute and the irrationality of CMS's rule.  Opzelura *does* involve a significant change to

ruxolitinib's pharmacokinetics and pharmacodynamics. But because the final regulatory text concludes that a new formulation is "for a drug, a change to the drug, *including, but not limited* to … a change in dosage form," *id.* at 87,101-02 (emphasis added), Incyte is left to conclude that CMS's decision to exempt changes to an active ingredient's pharmacokinetics or pharmacodynamics from the definition of "line extension" does not override this regulatory text and that therefore CMS believes Opzelura to be a line extension of Jakafi.

59.     Understanding that the rule would be difficult to implement, CMS promised that "CMS staff is available to assist manufacturers with any operational questions," despite the fact that "[w]e do not believe that that the definitions we are finalizing in this rule contain inconsistencies." 85 Fed. Reg. at 87053. And elsewhere in the rule: "We understand that the statutory requirement to apply the alternative rebate calculation to a drug that is a line extension may be operationally confusing and difficult, but we do not believe that that it is illogical or impossible." 85 Fed. Reg. at 87041. But: "[a]s always, CMS staff is available to assist manufacturers with operational concerns." *Id.*

## FACTUAL BACKGROUND

60.     In 2003, Incyte began the research that led to the discovery of the ruxolitinib molecule, a so-called Janus kinase or "JAK" inhibitor. JAK inhibitors were recognized as a potential treatment of autoimmune diseases and, by 2005, research revealed the potential to treat bone marrow diseases known as myeloproliferative neoplasms (MPNs), including myelofibrosis, a rare form of chronic leukemia, and polycythemia vera, another rare blood cancer.

61.     Incyte initiated a two-pronged strategy, seeking to develop a JAK inhibitor molecule to be used *topically* to treat autoimmune diseases that would benefit from topical administration, such as plaque psoriasis, while simultaneously developing a JAK inhibitor for *oral*

administration as a treatment for MPNs.  Incyte filed an Investigational New Drug (IND) application for a topical ruxolitinib in February 2007 and an IND for an oral ruxolitinib in March 2007.  Thus, Incyte's work on the alleged "line extension" actually predates the "original" drug.

62.     In the first patient dosed in the first clinical trial investigating the use of the oral tablet form of ruxolitinib to treat patients with myelofibrosis, ruxolitinib demonstrated promising results, spurring additional clinical development.  Recognizing that myelofibrosis is a rare and fatal disease that had no adequate treatments, Incyte harnessed its financial resources, invested in bringing in sufficient personnel with cancer expertise, and prioritized the development of the oral form of ruxolitinib.  Due to the company's limited resources, this meant deemphasizing research into the use of ruxolitinib in dermatological conditions.

### 1.     Incyte's Development of the Pathbreaking Oral Tablet Drug, Jakafi

63.     The FDA designated oral ruxolitinib as an orphan drug in light of the rare disease nature of myelofibrosis and also granted oral ruxolitinib Priority Review status in light of its potential as a major advance in treatment or as a treatment where no adequate therapy existed.  On November 16, 2011, the FDA approved five different strengths of oral ruxolitinib, which is marketed as Jakafi, to treat patients with intermediate or high-risk myelofibrosis, including primary myelofibrosis, post-polycythemia vera myelofibrosis and post-essential thrombocythemia myelofibrosis.  For each of these indicated uses, Jakafi was the first FDA-approved pharmaceutical treatment for patients and thus filled a significant unmet patient need.  As an oral tablet, Jakafi delivers the active ingredient, ruxolitinib, into the bloodstream through the gastrointestinal tract, and the vascular system then carries the ruxolitinib molecule systemically throughout the patient's body, including to the site of treatment (e.g., the affected bone marrow).

64.     Clinical studies have demonstrated that Jakafi provides "significant clinical benefits in patients with myelofibrosis by reducing spleen size, ameliorating debilitating myelofibrosis-related symptoms, and improving overall survival." Verstovsek S, Mesa RA, Gotlib J et al., *A double-blind, placebo-controlled trial of ruxolitinib for myelofibrosis*, New England Journal of Medicine (2012; 366:799-807).  The 30% improvement in overall survival among patients using Jakafi was the first, and remains the only, demonstration of such an effect for *any* drug in myelofibrosis, and it is all the more remarkable given that crossover from the placebo arm to ruxolitinib was allowed in each study.  Verstovsek S, Mesa RA, Gotlib J et al., *Long-term survival in patients treated with ruxolitinib for myelofibrosis: COMFORT-I and –II pooled analyses*, Journal of Hematology & Oncology (2017; 10:156).

65.     In 2016, after years of additional research by Incyte scientists, FDA again granted breakthrough status to Jakafi  and designated Jakafi as an orphan drug for the treatment of patients with GvHD.  At that time, there were no approved treatments for steroid refractory GvHD.  The breakthrough therapy designation recognized the potential, based on clinical evidence, for Jakafi to address the unmet medical needs of patients with this life-threatening disease.  Three years later, in 2019, FDA approved Incyte's Supplemental New Drug Application (sNDA) to add a third indication for Jakafi for acute GvHD.  This approval was based on a single arm study, the results of which have since been confirmed by a randomized trial, a rarity in this disease state given its complexity and severity.  *See* Nelson Chao, *Finally, A Successful Randomized Trial for GVHD*, New England Journal of Medicine (2020; 382:1853-1854).  Additional studies have shown that "ruxolitinib in the real life setting is an effective and safe treatment option for GVHD." Virginia Escamilla Gomez, *Ruxolitinib in refractory acute and chronic graft-versus-host disease: a multicenter survey study*, Nature (Nov. 7 2019).  On September 22, 2021, FDA granted

supplemental approval for an additional indication to treat chronic GvHD after failure of one or two lines of systemic therapy in adult and pediatric patients 12 years and older.

66.     Given the tremendous impact Jakafi has had on the lives of patients suffering from the serious, life-threatening diseases discussed above, Incyte has invested hundreds of millions of dollars of private funding in Jakafi to seek new oncology and hematology uses of this drug.  Each of the drug's four FDA-approved indications represents a treatment breakthrough for serious unmet needs in patients suffering from a rare disease.  Incyte also has studied the investigational use of Jakafi to treat solid tumors in breast cancer, colorectal cancer, and prostate cancer, as well as other conditions.

67.     Incyte is currently developing an extended release formulation of Jakafi ("XR") and expects to file a New Drug Application (NDA) in 2022.  If approved, XR will be an oral tablet indicated to treat the same conditions as Jakafi, but with slower bioabsorption of the ruxolitinib into the bloodstream.  This will, in turn,  allow for more convenient once-a-day systemic dosing rather than twice-a-day.  Incyte acknowledges that XR, if approved, will be a "line extension" of Jakafi, because the statute cites extended release formulations as an example of a line extension and the products will share at least some of the same indications, patient populations, and oral solid dosage form.

## 2.     *Incyte's Development of its New Topical Drug Opzelura*

68.     In 2014, after securing commercial sales for the oral form of ruxolitinib that could be reinvested in new areas of research, Incyte began to invest heavily in resources for dermatology, including hiring scientific and clinical experts, to advance its ongoing efforts to develop a topical application of ruxolitinib that could treat dermatological conditions. The company created a new dermatology/immunology division solely to work on this effort, hiring scientists with relevant

expertise in the area and running large clinical studies with patients having various dermatological conditions.  This effort was, and remains, separate from the division of Incyte devoted to cancer research.

69.     In December 2020, after six years of intensive and costly research and development totaling $470 million to date (which is expected to total $600 million by 2024), Incyte submitted an NDA for a new ruxolitinib cream to treat atopic dermatitis, a painful inflammatory skin condition that afflicts millions of Americans, causing the skin to become itchy, inflamed, or rash-like.  Unlike Jakafi, the cream is applied on skin, the pharmacological activity is limited to the site of application (the skin), and has a significantly lower systemic exposure.  In its Phase III clinical trials, ruxolitinib cream demonstrated clinically meaningful itch reduction.

70.     On September 21, 2021, FDA granted approval for Incyte's new ruxolitinib cream, with the brand name Opzelura.  Opzelura is indicated for the "topical short-term and non-continuous chronic treatment of mild to moderate atopic dermatitis in non-immunocompromised patients 12 years of age and older whose disease is not adequately controlled with topical prescription therapies or when those therapies are not advisable."  NDA 215309 Approval at 1, U.S. Food & Drug Administration (Sept. 21, 2021).  The FDA Division of Dermatology and Dentistry handled the review of Opzelura.  In contrast, completely distinct divisions within the FDA—the Division of Hematologic Malignancies I and the Division of Non-malignant Hematology—reviewed and approved Jakafi.

71.     Incyte also has completed large-scale Phase III clinical trials studying the use of this ruxolitinib cream to treat vitiligo, a long-term autoimmune skin condition in which patches of skin lose their pigment cells, resulting in discoloration.  Roughly five million Americans suffer from vitiligo, which has profound psychosocial impacts.  There is no FDA-approved drug on the

market today to treat vitiligo.  This work, like the atopic dermatitis work, is completely innovative.

Incyte recently announced that the FDA has accepted for Priority Review the supplemental New

Drug Application for Opzelura as a potential treatment for adolescents and adults (age ≥12 years)

with vitiligo.   Incyte Press Release (Dec. 14, 2021) available at https://investor.incyte.com/press-

releases/press-releases/2021/Incyte-Announces-Acceptance-and-Priority-Review-of-sNDA-for-

Ruxolitinib-Cream-Opzelura-as-a-Treatment-for-Patients-with-Vitiligo/default.aspx

72.    The Patent and Trademark Office has granted Incyte two patents specific to

Opzelura: US Patent No. 10,758,543 (expiration date: May 20, 2031) and US Patent No.

10,869,870 (expiration date: May 20, 2031).  Patent No. 10,758,543 provides patent protection for

Incyte's topical cream formulation of ruxolitinib, while Patent No. 10,869,870 patents the method

of treating atopic dermatitis with ruxolitinib cream.

73.    As compared to Jakafi, Opzelura is:

   a. indicated to treat entirely different conditions in a different therapeutic area—a
      change from antineoplastic to dermatological indications, with no overlap;
   b. an entirely different dosage form—a change from an oral solid to a topical cream;
   c. a directed therapy—the topical formulation is applied directly to the affected area
      of the skin, while Jakafi is released systemically throughout the bloodstream;
   d. supported by different safety and efficacy data developed specifically in relation
      to the new topical product;
   e. not interchangeable—oral solid Jakafi cannot be used to treat atopic dermatitis or
      vitiligo, and topical cream ruxolitinib cannot be used to treat bone marrow
      conditions or graft versus host disease;
   f. the subject of a separate NDA (not a supplemental NDA) supported by an array of
      human studies, including two large Phase III clinical studies;
   g. sold under its own trade name and standalone labeling; and
   h. covered by new patents that Incyte obtained based on the innovation in creating a
      new treatment in a different therapeutic area.

### 3.    Incyte's Efforts to Engage With CMS About Rebates for Opzelura

74.    Incyte has continuously sought to engage with CMS to avoid this lawsuit.

75.     During the notice and comment process, Incyte submitted a comment letter to CMS expressing its concern at the proposed definitions of "line extension" and "new formulation." Incyte's letter warned that the "proposed definitions capture far more innovative developments than was intended by Congress when addressing line extensions."  Incyte specifically cited its development of "topical ruxolitinib cream"—which would become Opzelura—as an example of the kind of innovative new drug that could be deemed a mere "line extension" under the agency's proposed definitions, despite being far more than a "slight alteration" of Jakafi.

76.     On April 12, 2021, after CMS had issued the final rule, Incyte sent a letter and white paper (described below) to the Director of CMS's Division of Pharmacy.  *See* Ex. A.  That letter explained that Incyte was preparing a ruxolitinib cream and was seeking FDA approval of the drug to treat atopic dermatitis and, eventually, vitiligo.  Under 42 U.S.C. § 1396r-8(c)(2)(C), the letter continued, the cream cannot be considered a line extension of Jakafi.  The letter included an extensive description of the relevant Incyte products, the statutory and regulatory framework, and an application of that framework to Incyte's products.

77.     Attached to that letter was an 18-page white paper that described Incyte's synthesis of the ruxolitinib molecule in the early 2000s, the creation of Jakafi, the development of Jakafi's extended release formulation (which concededly would constitute a future line extension of Jakafi), and the creation of the topical cream, now known as Opzelura.  *See* Ex. B.  The white paper compared Jakafi and Opzelura in numerous ways, demonstrating just how different the two drugs are in almost every conceivable manner.

78.     On June 28, 2021, CMS responded.  *See* Ex. C.  The agency's response acknowledged Incyte's letter and white paper, but, despite the rule's promise that "CMS staff is

available to assist manufacturers with any operational questions," 85 Fed. Reg. at 87035, asserted

that "we will not review or comment on the issues you raised."  Ex. C.

79.     On September 27, 2021, less than a week after FDA approved Opzelura, Incyte sent

a follow-up letter to CMS.  Ex. D.  The follow-up letter expressed regret at CMS's unwillingness

to engage in a "productive dialogue" and explained that, if CMS remained unwilling to engage in

a dialogue by October 22, 2021, Incyte would have no choice but to "take appropriate legal action

to protect [its] interests on this important issue."  *Id.*

80.     On October 22, 2021, CMS responded to Incyte, reiterating that it would not

"review or comment" on any of the issues raised.  Ex. E.  The letter concludes by warning that

"[i]f a subsequent review by CMS, the Office of Inspector General, or any other authorized

government agency determines that any further action is necessary, that agency will follow up

accordingly."  *Id.*  In light of this letter, the December 2020 rule, and CMS's unwillingness to

engage, Incyte filed this lawsuit.

## CLAIMS FOR RELIEF

### *FIRST CLAIM FOR RELIEF*

### Violation of the Administrative Procedure Act
### (Final Rule Contrary to Law)

81.     Plaintiff realleges and incorporates by reference all prior and subsequent

paragraphs.

82.     The APA requires courts to "hold unlawful and set aside" agency action that is "not

in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations."

5 U.S.C. § 706(2)(A), (C).

83.     CMS's final rule is contrary to law because it purports to require Incyte to treat

Opzelura as a "line extension" of Jakafi for purposes of calculating Medicaid rebates for Opzelura.

84.     Under the statute, Opzelura is not a line extension of Jakafi because, among other reasons, Opzelura is:

   a.   indicated to treat entirely different conditions in a different therapeutic area—a change from antineoplastic to dermatological indications, with no overlap;
   b.   an entirely different dosage form—a change from an oral solid to a topical cream;
   c.   a directed therapy—the topical formulation is applied directly to the affected area of the skin, while Jakafi® is released systemically throughout the bloodstream;
   d.   supported by almost entirely different safety and efficacy data developed specifically in relation to the new topical product;
   e.   not interchangeable—oral solid Jakafi cannot be used to treat atopic dermatitis or vitiligo, and topical cream ruxolitinib cannot be used to treat bone marrow conditions or graft versus host disease;
   f.   the subject of a separate new drug application (NDA) (not a supplemental NDA) supported by an array of human studies, including two large Phase III clinical studies, and will be sold under its own trade name and standalone labeling; and
   g.   covered by new patents that Incyte obtained based on the innovation in creating a new treatment in a different therapeutic area.

85.     The text, purpose, context and history of the Medicaid Rebate Act all demonstrate that Congress intended for the new formulation and line extension alternative rebate requirements to apply only to slight alterations to an existing product, and only where the original and line extension products are both oral solid dosage forms.  Because Opzelura is neither an oral solid dosage form nor a minor alternation of Jakafi, it is not properly considered a line extension under the statute.

### SECOND CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act**
**(Arbitrary and Capricious Refusal to Provide Guidance)**

86.     Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

87.     The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary" or "capricious."  5 U.S.C. § 706(2)(A).  And CMS's rule provides that "CMS staff is available to assist manufacturers with any operational questions."  85 Fed. Reg. at 87035.

88.     CMS's decision to refuse to provide guidance to Incyte as to whether Opzelura is subject to the alternative rebate calculation provision was arbitrary and capricious because CMS's June 28, 2021 and October 27, 2021 letters to Incyte failed to offer a reasoned explanation for its refusal to address Incyte's analysis and white paper in any meaningful way, despite the serious collateral consequences and potential risks associated with Incyte's decision over how to classify Opzelura.

89.     CMS's unreasoned decision to provide no guidance, thereby forcing Incyte to file this lawsuit, violated 5 U.S.C. § 706(2)(A).

### THIRD CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act**
**(Arbitrary and Capricious Final Rule)**

90.     Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

91.     The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary" or "capricious."  5 U.S.C. § 706(2)(A).  "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  "[U]nexplained inconsistencies in [a] final rule" are arbitrary and capricious.  *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015).  And "'A long line of precedent has established that an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations

differently.'"  *Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999) (quoting

*Transactive Corp. v. United States,* 91 F.3d 232, 237 (D.C. Cir. 1996)).

92.     CMS's final rule is inadequately explained, substantively unreasonable, and

arbitrary and capricious.  Among other things, the rule fails adequately to explain the agency's

change in position on the correct interpretation of several important statutory terms, including "line

extension" and "new formulation."  The rule also contains internal and material inconsistencies in

its treatment of different drugs and drug formulations and does not adequately address important

substantive comments received from various stakeholders, including from Incyte.

93.     Congress's repeated statements in legislative history demonstrate that it intended

for the line extension provision to apply only to slight alterations of existing products.  Although

the rule acknowledged the Congressional references to "slight alterations," it then inappropriately

gave no weight to this aspect of the legislative history in its interpretation of the statute.  Nor did

CMS discuss or place any weight on the fact that Congress amended the statute in 2016 to exclude

abuse-deterrent formulations that Congress had explicitly concluded that making abuse-deterrent

formulations "line extensions" was "*unintended*."

94.     The final rule fails to adequately explain why "combination" drugs, existing drugs

approved for new indications but not otherwise altered, and new drugs that involve a change to the

"pharmacokinetics or pharmacodynamics" of the active ingredient used in an existing drug should

be excluded from the regulatory definition of line extension, but that drugs approved by FDA for

new indications in new dosage forms should be treated as a line extension.

95.     CMS also failed to explain its change in position.  In 2012, CMS was prepared to

finalize a definition of "line extension" significantly at odds with the final rule at issue here.  For

example, the 2012 rule interpreted the Medicaid Rebate Act to require that both the initial product

and the line extension product must be oral solid dosage forms.  The 2020 rule reverses position on this issue, without explaining adequately what has changed.

96.     These failures to adequately explain important aspects of the problem, to give proper credit to Congress' intent, and to adequately consider comments received from stakeholders such as Incyte, render the final rule arbitrary and capricious in violation of the APA.  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

## PRAYER FOR RELIEF

**NOW, THEREFORE,** Plaintiff Incyte requests a judgment in its favor against Defendants as follows:

1.     Declare that CMS's final rule (85 Fed. Reg. 87000), which purports to require Incyte to treat Opzelura as a "line extension" of Jakafi, is not in accordance with law, and is in excess of CMS's statutory jurisdiction, authority, and limitations;

2.     Declare that CMS's refusal to provide guidance to Incyte as to whether Opzelura is subject to the alternative rebate calculation provision for line extensions is arbitrary and capricious;

3.     Declare that CMS's final rule (85 Fed. Reg. 87000), fails to engage in reasoned decision-making, and thus is arbitrary and capricious;

4.     Vacate and set aside CMS's final rule as applied to Opzelura and Jakafi;

5.     Enter a permanent injunction restraining Defendants from enforcing, applying, or implementing CMS's final rule as applied to require Incyte to treat Opzelura as a "line extension" of Jakafi;

6.     Award Plaintiff reasonable attorneys' fees and costs; and

7.     Grant such other and further relief as the Court may deem appropriate.

DATED:  December 28, 2021.

Respectfully submitted,


/s/ Jeffrey L. Handwerker
Jeffrey L. Handwerker
  (D.C. Bar No. 451913)
R. Stanton Jones
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 942-5000 (phone)
(202) 942-5999 (fax)
jeffrey.handwerker@arnoldporter.com